IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CARL MANORA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:07-CV-1747-N |
| | § | |
| JOHN E. POTTER, POSTMASTER | § | |
| GENERAL OF THE UNITED STATES | § | |
| | § | |
| Defendant. | § | |

## ORDER

This Order addresses Defendant Postmaster General John E. Potter's motion for summary judgment [15].  Potter contends that Plaintiff Carl Manora fails to establish a genuine fact issue with regard to essential elements of his race and gender discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.  Because Manora has not met his burden to demonstrate a genuine issue of material fact that the legitimate, nondiscriminatory reasons that Potter advances are a pretext for race or gender discrimination pretext with respect to either claim, the Court grants the motion.

## I. ORIGINS OF MANORA'S COMPLAINT

Manora, an African-American male, joined the United States Postal Service Office of Inspector General ("OIG") in June of 1997 and continues to work there today.  Manora asserts that the OIG discriminated against him on the basis of race and gender when it failed to select him for any of six open positions during the organization's 2004 restructuring effort.

### A. The Beginnings of Manora's Career

The OIG is a division of the United States Postal Service that investigates postal service programs and operations in order to identify and eliminate fraud and abuse. Manora started his career with the OIG as an auditor in the organization's headquarters office in Washington, D.C. In 2003, after a series of reorganizations within the agency, the OIG appointed Manora to an audit manager position in the Dallas, Texas field office, specifically in the Network Operations and Logistics directorate. As an audit manager, Manora supervised audit staff, developed and reviewed written audit reports, and managed various other projects.

### B. The Audit Manager "Recompetition"

In the summer of 2004, the new Inspector General – concerned that the audit manager positions were not filled through a competitive process during the last reorganization – required all audit managers to reapply for their positions in an open competitive process.[1] On August 24, 2004, the OIG issued an internal vacancy announcement that identified forty-two open audit manager positions across the country. The announcement indicated that any qualified auditor could apply for any audit manager position in any city where vacancies existed.[2] *See* Pl.'s App. at 15-16 [20-2]. Incumbent audit managers who were not selected

---

[1]Specifically, employees had to reapply in order to retain their positions as incumbent audit managers, to transfer to different cities, or to receive a promotion from an auditor position to an audit manager position.

[2]The OIG developed a "proposed plan for audit manager recompetition," which outlined the selection process. *See* Def.'s App. at 14 [16-8]. After an initial screen by the Human Resources department, a panel of supervisors reviewed each candidate according to

to retain their positions in the "recompetition" would not lose pay, but would begin to perform audit services rather than serve in a management role.

Manora applied for six positions in the audit manager recompetition. He applied for vacancies in the Network Operations and Logistics directorate in Atlanta, Georgia, Arlington, Virginia, and Dallas, Texas, where he was the incumbent manager. His manager at the time, Joseph Oliva, was the selecting official for the directorate. Manora also applied for vacancies in the Delivery and Retail directorate in the same three cities. Debra Pettitt was the selecting official for those positions. Oliva and Pettitt conducted a joint telephone interview of Manora for all six vacancies.

Oliva and Pettitt did not select Manora for any of the positions he sought. As a result, the OIG reassigned Manora to an auditor position, with no loss of pay.[3] Manora contends that his nonselection by Oliva for the Network Operations and Logistics positions was motivated by race discrimination and that his nonselection by Pettitt for the Delivery and

---

various criteria and assigned each application a point value. The evaluation criteria included "desirable qualifications," such as professional certification, previous supervisory experience, and experience in leading complex, multi-site audits, as well as "evaluation factors," such as knowledge of accounting and auditing theory, concepts, and standards, ability to provide full range of technical and administrative supervision, and ability to develop and review written audit reports. *Id.* Each audit director received a list of the candidates in alphabetical order and a chart comparing the candidates' assessment score. The audit directors jointly scheduled interviews of the candidates using a standard list of questions. After interviewing all of the applicants, the audit director of each directorate acted as the "selecting official" for the available positions within his or her directorate and made final selection decisions.

[3]In 2005, Manora applied for and received an audit manager position in the Retail and Delivery directorate in Dallas.

ORDER – PAGE 3

Retail positions was motivated by gender discrimination. The chart below shows the demographic information for the individuals who were selected to fill the vacancies.

|  | Network Operations and Logistics directorate | Delivery and Retail directorate |
| --- | --- | --- |
| Dallas | Caucasian Female | African-American Female |
| Atlanta | Caucasian Male | African-American Female |
| Arlington | Caucasian Male | African-American Female |

*See* Def.'s Mot. for Summ. J. at 15 [15]. Potter disputes that Manora's nonselection was motivated by race or gender and offers various reasons for Oliva and Pettitt's final selection decisions, described below.

### C. The Reasons for Manora's Nonselection for a Position In the Network Operations and Logistics Directorate

According to Potter, Oliva's selection decisions were not motivated by race, but rather by his interactions with the candidates over the course of his career and his assessment of which candidate was best suited for each position.

Oliva selected one of Manora's co-workers, Vicky Walker, for the Dallas audit manager position. He observed both Manora and Walker perform audit manager functions at various times from 2000-2004 and considered Walker a more "engaged" and "hands-on" manager. According to Oliva, "[Manora's] management style was standoffish. I think he would tell you he likes to 'coach and mentor.' [Walker], on the other hand, was more 'role [*sic*] up your sleeves.' . . . [Manora] was qualified and contributed – but in my opinion, [Walker] was more engaged and contributed more." Pl.'s App. at 18 [20-3]. Although Oliva

ORDER – PAGE 4

believed that both Manora and Walker were competent and qualified for the position, he asserts that he selected the individual that he thought *best* qualified for the job and that he thought his directorate could "afford to lose least." *Id.* That was Walker. Thus, Manora did not receive the audit manager position in the Dallas office.

Oliva selected Jerry Werking for the Arlington audit manager position, who Oliva contends had a superior educational background (a Masters of Business Administration and status as a Certified Public Accountant) to both the incumbent manager and Manora. Def.'s App. at 25-26 [16]. Additionally, Oliva worked with Werking prior to the recompetition and found him "instrumental in developing a methodology for consolidating mail loads and identifying potential savings." *Id.* According to Oliva, "since [Werking's] education, certifications and performance conducting audits was superior to [Manora's], I could not justify the cost of moving [Manora] from Texas to Virginia although relocation was authorized." *Id.* Thus, Manora did not receive the audit manager position in the Arlington office.

Finally, Oliva selected the incumbent audit manager, Jody Troxclair for the Atlanta audit manager position. According to Oliva, "[Troxclair] was qualified and an engaged audit manager. [Troxclair] was more engaged in the audit process than [Manora], so I selected [Troxclair]." *Id.* at 25.

### D. The Reasons for Manora's Nonselection for a Position in the Delivery and Retail Directorate

According to Potter, Pettitt's selection decisions were not motivated by gender, but rather by the candidates' level of subject matter expertise in the Delivery and Retail

ORDER – PAGE 5

directorate and their performance during the interview process. Although Pettitt ranked Manora in the top three candidates for the Dallas and Atlanta positions, she ultimately did not select him. *Id.* at 8. According to Pettitt, Manora had less experience in the directorate and performed worse in his interview than the candidates she chose. *Id.*

Pettitt asserts that experience within the Delivery and Retail directorate was a central concern for her throughout the selection process: "I considered subject matter experience to be very important to my selection and for this reason wanted to make sure that the incumbents would be equally considered." *Id.* at 7. As a result, she expanded the initial list of candidates for the Arlington position in order to increase the number of potential candidates with specialized experience within the directorate. Additionally, "the most vacancies were in Arlington and most candidates applied for multiple positions. I wanted to assure an adequate number of candidates in Arlington in the event my selectee accepted a position in a different directorate." *Id.* Although Manora did not have the Delivery and Retail directorate experience that Pettitt sought, he remained on the candidate list. Pettitt conducted interviews of all of the listed candidates.

According to Pettitt, Manora did not perform well in his interview: his "answers were not as articulate or specific as I would have expected from someone with his experience level, and he did not provide the level of detail to warrant displacing an incumbent audit manager when he lacked specific subject matter experience in Delivery and Retail." *Id.* at 8.

After conducting all of the interviews, Pettitt selected all three of the incumbent audit managers to retain their positions in the directorate. She stated: "I did not want to disrupt performance of the directorate by replacing the audit managers three months into the performance year when they were performing well." *Id.*

### E. The Instant Summary Judgment Motion

Potter now moves for summary judgment on Manora's race and gender discrimination claims. Because Manora has failed to produce any competent summary judgment evidence that the OIG's reasons for electing not to place him in an audit manager position in 2004 are a pretext for race or gender discrimination, Potter is entitled to summary judgment.

### II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In making this determination, courts must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). However, courts need not sift through the record in search of triable issues. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of the basis for its belief that there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden shifts to the nonmovant to

establish that there is a genuine issue of material fact such that a reasonable jury might return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Moreover, "[c]onclusory allegations, speculation, and unsubstantiated assertions" will not suffice to satisfy the nonmovant's burden. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc).

### III. TITLE VII FRAMEWORK

Title VII of the Civil Rights Act of 1964 prohibits an employer from refusing to hire or otherwise discriminating against any individual on the basis of race or sex. 42 U.S.C. § 2000e-2(a)(1). The relevant inquiry is "whether the defendant intentionally discriminated against the plaintiff." *Johnson v. Louisiana*, 351 F.3d 616, 621 (5th Cir. 2003) (quoting *United States Postal Svc. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)).

In order to establish a claim for race or gender discrimination under Title VII in the absence of direct evidence of discrimination, a plaintiff must first establish a prima facie case.[4] *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009) (citing *Abarca v. Metro. Transit Auth.*, 404 F.3d 938, 941 (5th Cir. 2005); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If the plaintiff meets this initial burden, "an inference of intentional discrimination is raised and the burden of production shifts to the employer," who must articulate a legitimate, nondiscriminatory explanation for the adverse employment

---

[4]In order to establish a prima facie case of race or gender discrimination under Title VII, a plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) others outside the protected class were treated more favorably. *See Alvarado v. Texas Rangers*, 492 F.3d 605, 611 (5th Cir. 2007).

action. *Id.* at 259. Then, if an employer meets its burden of production, "the inference of discrimination drops out and the burden shifts back to the employee to demonstrate that the employer's explanation is merely a pretext for racial bias." *Id.* (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). A plaintiff may do this in one of two ways. He may "offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motive[s] alternative)." *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005) (quoting *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)).

For the purposes of this motion for summary judgment only, Potter concedes that Manora has made a prima facie case for race and gender discrimination. Nonetheless, Potter argues that he is entitled to summary judgment on Manora's race and gender discrimination claims because the OIG had legitimate, nondiscriminatory reasons for failing to select Manora for any of the audit manager positions he sought and Manora has no evidence that Potter's proffered reasons are pretextual. The Court considers each of these issues in turn.

## IV. THE REASONS FOR MANORA'S NONSELECTION ARE LEGITIMATE AND NONDISCRIMINATORY

Assuming, *arguendo*, that Manora can establish a prima facie case, Potter must offer a legitimate, nondiscriminatory reason to support the OIG's selection decisions. He does.

### A. The Network Operations and Logistics Directorate Selections

According to Oliva, the selecting official for the Network Operations and Logistics directorate, his selection decisions for the Dallas, Arlington, and Atlanta positions were based on various nondiscriminatory reasons, which the Court described in detail above. In sum, Oliva asserts that he selected Walker for the Dallas position and Troxclair for the Atlanta position because they were more engaged managers than Manora. He asserts that he selected Werking for the Arlington position because he had a superior educational background and was "instrumental" in identifying potential savings; additionally, Oliva could not justify the cost of moving Manora from Texas to Virgina.

Some of Oliva's explanations – for instance, his assessment that Manora was "less engaged" than the Walker and Troxclair – are subjective in nature. "An employer's subjective reason for not selecting a candidate, such as a subjective assessment of the candidate's performance in an interview, may serve as a legitimate, nondiscriminatory reason for the candidate's nonselection." *Alvarado v. Tex. Rangers*, 492 F.3d 605, 616 (5th Cir. 2007); *see also Manning v. Chevron Chem. Co.*, 332 F.3d 874, 882 (5th Cir. 2003) (affirming grant of summary judgment because employee did not raise genuine issue of fact that subjective hiring criteria were a pretext for discrimination). However, subjective reasons will satisfy the employer's burden of production "only if the employer articulates a clear and reasonably specific basis for its subjective assessment." *Alvarado*, 492 F.3d at 616.

Here, Oliva's subjective reasons for the employment decisions at issue are clear and reasonably specific. In his role as audit director, Oliva was aware of the work product and

leadership styles of the candidates he selected as well as that of Manora.  Although the Court does not discuss them at length, Oliva provided various examples to demonstrate Manora's comparative lack of "engagement" in the auditing process.  *See* Def.'s App. at 24 (explaining, for instance, that Walker actively defended audit findings in a meeting about a contentious audit, whereas Manora observed the discussion with minimal participation). Thus, the Court concludes that – with respect to the audit manager positions in the Network Operations and Logistics directorate – Potter meets his burden to demonstrate legitimate, nondiscriminatory reasons for Manora's nonselection.

### B. The Delivery and Retail Directorate Selections.

According to Pettitt, the selecting official for the Delivery and Retail directorate, her selection decisions were based on (1) Manora's lack of specialized experience in audits of Postal Service Delivery and Retail programs and operations, and (2) Manora's poor performance during the selection interview.  Ultimately, Pettitt decided that all three incumbent audit managers should remain in their positions.

Pettitt's second reason, Manora's interview performance, is subjective in nature. However, she too offers a clear and reasonably specific basis for her subjective assessment. According to Pettitt, Manora could not answer "specific questions about particular situations with detailed answers."  Def.'s App. at 8.  Rather, he spoke in vague, general terms.  *Id.* This, coupled with Pettitt's objective acknowledgment of Manora's lack of expertise in the directorate, constitutes a legitimate, nondiscriminatory reason for Manora's nonselection.

Because Potter meets his burden to demonstrate legitimate, nondiscriminatory reasons for the employment decisions at issue, the burden shifts to Manora to demonstrate that these reasons are pretext for race and gender discrimination or that Manora's race and gender were a "motivating factor" in the decision.

### V. MANORA FAILS TO SHOW PRETEXT

Manora can demonstrate that the reasons Potter offers for Manora's nonselection are pretext for race and gender discrimination in one of two ways: (1) he can show that Potter's explanations are false or unworthy of credence; or (2) he can show that he was "clearly better qualified" than the individuals selected for the audit manager positions. *See Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 412 (5th Cir. 2007)[5] (citing *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003); *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 356-57 (5th Cir. 2001)).  Manora alleges various facts in an effort to show pretext. The Court evaluates whether any of these facts demonstrate that Potter's explanations are false or unworthy of credence or that Manora was clearly better qualified than the selectees.

---

[5]The "clearly better qualified" standard typically applies in the context of an employer's failure to hire or promote an employee.  *See, e.g.*, *Bright v. GB Bioscience, Inc.*, 305 Fed. App'x 197, 205 n.8 (5th Cir. 2008); *Burrell*, 482 F.3d at 412.

Here, the employment decision at issue involves the OIG's failure to select Manora for a job that he held prior the recompetition.  Facing similar facts, the Fifth Circuit applied the clearly better qualified standard in *Gillaspy v. Dallas Indep. Sch. Dist.* 278 Fed. App'x 307, 313 (5th Cir. 2008).  There, an employer required an employee to apply for a job that closely resembled her existing position due to a corporate reorganization.  *Id.* at 308-09.  Likewise, this Court holds that, here, Manora can establish pretext if he demonstrates that he was clearly better qualified than the selectees.

### A. The Network Operations and Logistics Directorate Selections

First, the Court considers whether any of Manora's allegations cast doubt on Oliva's veracity or show that Manora was, in fact, a clearly better qualified candidate for the positions in the Network Operations and Logistics directorate.

#### 1. Manora fails to show that Oliva's explanations are false or unworthy of credence.

– In general, "[a]n explanation is false or unworthy of credence if it is not the real reason for the adverse employment action." *Laxton*, 333 F.3d at 578. "Evidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's prima facie case, is likely to support an inference of discrimination [or retaliation] even without further evidence of the defendant's true motive." *Staten*, 187 Fed. App'x at 358 (quoting *Laxton*, 333 F.3d at 578). Manora presents two arguments which appear to attack Oliva's credibility.

First, Manora claims that Oliva's explanation for his selection decisions shifted over time, from choosing who his directorate could "afford to lose least" to subjectively choosing "the best qualified for the job." Pl.'s Resp. at 12. "When an employer offers inconsistent explanations for its employment decision at different times . . . the jury may infer that the employer's proffered reasons are pretextual." *Staten v. New Palace Casino, LLC*, 187 Fed. App'x 350, 359 (5th Cir. 2006) (collecting cases); *see Gee v. Principi*, 289 F.3d 342, 347-48 (5th Cir. 2002). The Court examines two statements by Oliva in order to evaluate whether his explanation has shifted over time.

In his April 2005 EEO investigative affidavit, Oliva listed a range of factors that informed his selection decisions. Describing the selection process, he stated "I considered [Manora's] experience and performance." Pl.'s App. at 18 [20-3]. Additionally, he explained his decision to select Walker instead of Manora for the Dallas position:

> Both [Manora] and [Walker] applied for multiple positions both in and out of my directorate. Since both [Manora] and [Walker] were qualified, I believed that the individual I did not select – either [Manora] or [Walker] – would probably be selected by another director, and as a result, would be lost to my directorate.
>
> As a result, my judgment was necessarily based on my evaluation of which individual I thought my directorate could afford to lose least. Both were qualified. Both contributed. My judgment was based on my evaluation of their relative performance over the years that I had known and worked with them. It had nothing to do with race or gender.
>
> [Manora's] management style was standoffish. I think he would tell you he likes to 'coach and mentor.' [Walker], on the other hand, was more '[roll] up your sleeves.' My audit teams are small – generally seven people or less. Conversely, our audit responsibility is large. As a result, everyone, including me, has to directly engage. . . . [Manora] was qualified and contributed – but in my opinion, [Walker] was more engaged and contributed more."

*Id.* at 19-20.

In a June 2009, Manora's explanation was nearly identical. He indicated that he considered "education, experience, certifications, and performance," as instructed by the vacancy announcement. Again, he described his decision to select Walker: "I thought [Manora] or [Walker] would be selected by at least one of the directorates, since both of them had applied for multiple positions, and I wanted to select the strongest candidates for my directorate." Def.'s App. at 23 [16]. He emphasized that Manora was not as engaged in audit tasks as Walker. *Id.* at 24.

ORDER – PAGE 14

There is no material difference between these two statements.  Throughout the duration of this lawsuit, Oliva has maintained that he sought to choose the individual best qualified for each open position, based on his performance and other qualifications.  He need not restate his April 2005 affidavit word for word in order to remain consistent.[6]  Selection decisions such as Oliva's are dynamic, and, as in the promotion context, "the relative importance placed on various selection criteria cannot be expected to remain fixed and unyielding."  *Nichols v. Lewis Grocer*, 138 F.3d 563, 568 (5th Cir. 1998) (finding, in the context of an alleged failure to promote, that a plaintiff's "shifting explanations" argument did not demonstrate pretext).  Accordingly, Manora fails to demonstrate pretext on this basis.

Second, Manora cites Oliva's evaluations of his performance in the time period before his nonselection in an effort to challenge Oliva's veracity.  According to Manora, they show that he was, contrary to Oliva's statements in the course of this litigation, a hands-on manager and a team player.  For example, five days after Oliva failed to select Manora for an audit manager position, he wrote:

> [Manora] is a leader who demonstrates the highest ethical standards, is respected and trusted, and creates a sense of organizational pride and excellence.  He keeps his subordinates and organizational leadership fully informed.  He demonstrates compassion, leads by example, promotes positive morale, and always responds to the needs of others.  He accepts responsibility for his actions and holds others accountable for theirs. [Manora] is well respected by those around him.

---

[6]Manora fails to explain how Oliva's initial explanation, that he wanted to select the candidate that his directorate could afford to lose least, is inconsistent with his later wording, that he wanted to select the strongest candidates for his directorate.

Pl.'s App. at 2-3.  Manora alleges that this 2004 performance evaluation undermines the credibility of Oliva's explanation that Manora was not as engaged in audit tasks as Walker or Troxclair.[7]  In this context, it does not.

Oliva does not dispute that Manora performed his job well in many respects.  Even so, Manora's positive performance evaluations do not contradict Oliva's evaluation that Manora's management style was less engaged than that of other managers.  The central issue is not whether Manora was a hands-on manager in a vacuum, but rather whether he was a more engaged leader *compared* to Walker and Troxclair.  The only evidence that Manora presents on this point is his own subjective assessment that he was, in fact, more hands-on than the other candidates.  This is insufficient.  *See Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir. 2000) (declining to rely on plaintiff's subjective belief regarding discriminatory intent).  Accordingly, Manora fails to demonstrate pretext on this basis.

**2. Manora fails to show that he was clearly better qualified.**  –  The remaining facts Manora alleges with respect to the Network Operations and Logistics directorate relate to his qualifications and achievements.  To the extent that these facts show that he was "clearly better qualified" than the selectees, Manora can survive summary judgment.  "[A] showing that the unsuccessful employee was clearly better qualified is enough to prove that the employer's proffered reasons are pretextual."  *Price v. Fed. Exp. Corp.*, 283 F.3d 715, 723

---

[7]Oliva does not assert that Manora was less engaged than Werking, the other selectee, but rather that he had superior educational background and was "instrumental" in identifying potential savings; additionally, Oliva claims that he could not justify the cost of moving Manora from Texas to Virgina.

(5th Cir. 2002) (citing *EEOC v. La. Office of Cmty. Servs.*, 47 F.3d 1438, 1444 (5th Cir. 1995); *Odom v. Frank*, 3 F.3d 839, 845-46 (5th Cir. 1993)); *see also Eberle v. Gonzales*, 240 Fed. App'x 622, 630 (5th Cir. 2007). In order to meet this standard, Manora must present some evidence "from which a jury could reasonably infer that 'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate[s] selected over the plaintiff for the job in question.'" *Austin v. La. Generating, L.L.C.*, 265 Fed. App'x 207, 210 (5th Cir. 2008) (*citing Deines v. Texas Dep't of Protective & Regulatory Servs.*, 164 F.3d 277, 280-81 (5th Cir. 1999)). "[B]etter education, work experience, and longer tenure with the company do not establish that [an applicant] is clearly better qualified" for a particular position. *Price*, 283 F.3d at 723; *see Thomas v. Trico Prods. Corp.*, 256 Fed. App'x 658, 662 (5th Cir. 2007). "Ultimately, the law requires only that the employer's decision is 'somewhere within the realm of reason.'" *Thomas*, 256 Fed. App'x at 662 (citing *Deines*, 164 F.3d at 282).

In an effort to demonstrate pretext, Manora describes his complimentary performance evaluation, status as a "high contributor," receipt of an increase in pay and cash bonus in the year before his nonselection, 15 years of experience as a supervisor, MBA degree, certifications as a Certified Fraud Examiner and Certified Government Financial Manager, production of products and identification of savings, and "knowledge, skills, and abilities"

ORDER – PAGE 17

ranking.[8]  *See* Pl.'s Resp. at 18-19.  As this list demonstrates and Potter concedes, Manora was qualified for the position.

However, Manora cannot establish that he was *clearly better* qualified.  The selectees – Walker, Werner, and Troxclair – were at least as qualified as Manora.  Walker received a higher score on her 2004 performance evaluation, received an "exceptional contributor" ranking in one evaluation category, had supervisory experience at the OIG, participated in allegedly high-profile and successful audits, and was a Certified Government Financial Manager.  *See* Pl.'s App. at 72-80.  Similarly, Werking had supervisory experience at the OIG, developed a methodology for consolidating mail loads and identifying potential savings, held an MBA degree, and was a Certified Public Accountant.  *See* Def.'s App. at 5-8 [16-4].  Likewise, Troxclair had supervisory experience at the OIG and performed and managed a variety of complex audits.  *See id.* at 11-22.  Further, after observing the performance of each of the candidates, Oliva believed that Walker and Troxclair were more engaged managers than Manora.

Comparing Manora's qualifications to those of the selectees, Manora cannot show that no reasonable person, in the exercise of impartial judgment, could have chosen Walker, Werner, and Troxclair over him for the positions in question.  Accordingly, he fails to show pretext on this ground.

---

[8]To the extent that Manora offers these facts to demonstrate that Oliva's explanation is false or unworthy of credence, he fails to demonstrate a genuine issue of material fact. Taking all of Manora's qualifications and achievements at face value, they do not discredit Oliva's explanation that Manora was not the *best* candidate for the available positions.

### B. The Delivery and Retail Directorate Selections

Next, the Court turns to Pettitt's selection decisions.  It considers whether any of Manora's allegations cast doubt on Pettitt's veracity or show that Manora was, in fact, a clearly better qualified candidate for the positions in the Delivery and Retail directorate.

### 1. Manora fails to show that Pettitt's explanations are false or unworthy of credence. – Manora makes two arguments in an attempt to cast doubt on Pettitt's explanations.

First, Manora claims that Pettitt engineered the selection process in order to ensure that a specific female selectee was included on the candidates list for the Arlington audit manager position.  Pettitt admits that she reduced the cutoff score in order to expand the applicant pool.  She asserts two legitimate, nondiscriminatory reasons for her decision.  First, she claims that she wanted to expand the list because: "the most vacancies were in Arlington and most candidates applied for multiple positions.  I wanted to assure an adequate number of candidates in Arlington in the event my selectee accepted a position in a different directorate."  Def.'s App. at 7 [16].  Further, Pettitt asserts that she lowered the cutoff score to include the otherwise excluded incumbent because she wanted to extend all of the incumbents in her directorate the opportunity to interview for their former positions.  *Id.* According to Pettitt, this decision was not based on the incumbent's gender, but rather on her specialized experience in the directorate.

Manora offers no evidence to rebut the reasons that Pettitt offers for her decision to expand the applicant pool.  In the Fifth Circuit, "an employer's 'disregard of its own hiring

ORDER – PAGE 19

system does not of itself conclusively establish that improper discrimination occurred or that a nondiscriminatory explanation for an action is pretextual.'" *EEOC v. Tex. Instruments Inc.*, 100 F.3d 1173, 1182 (5th Cir. 1996) (citing *Risher v. Aldridge*, 889 F.2d 592, 597 (5th Cir. 1989)); *see Laxton v. Gap Inc.*, 333 F.3d at 581 n.3. Accordingly, Manora fails to establish pretext on this ground.

Second, Manora briefly asserts that African American males are underrepresented in pay grade levels greater than Grade 14 at the OIG. According to Manora, of the approximately forty employees at the Director level (Grade 15), not any were African American males, while fifteen percent were African American females at the time of the recompetition. Further, he claims that, of the seventy staff members at the managerial level, less than eight percent were African American males. *See* Pl.'s App. at 2 [20-3].

The Court is at a loss to understand how this statistical information demonstrates pretext. Manora offers no source for this data, other than his own allegations in his EEO affidavit. *Id.* Moreover, he provides no context for the statistics he offers. For instance, he does not indicate the number of qualified male African American applicants for such positions or the rate of selection for such applicants. Without any further information, this data fails to present any evidence of pretext. *See Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 583 (5th Cir. 2006) ("These statistics are not probative of discriminatory intent because they are devoid of context."); *EEOC v. Tex. Instruments, Inc.*, 100 F.3d 1173, 1185 (5th Cir. 1996) ("The probative value of statistical evidence ultimately depends on all the surrounding

ORDER – PAGE 20

facts, circumstances, and other evidence of discrimination."). Thus, Manora fails to establish pretext on this ground.

**2. Manora fails to show that he was clearly better qualified. –** Again, Manora describes his qualifications and achievements in an effort to show pretext. And again, he cannot show that he was *clearly better* qualified than the selectees. All three of the incumbent audit managers – Pickett, Oliver, and Langston – had specialized experience in the directorate, a quality which Manora lacked and which Pettitt considered "very important to [her] selection." Def.'s App. at 7. Pickett had more than ten years of supervisory experience, held a Master of Science in procurement and acquisition, was a Certified Government Financial Manager, and held a Level III Contracting Certification. Pl.'s App. at 53-65. Oliver had more than eleven years of supervisory experience and held a Master of Business Administration. *Id.* at 45-52. Langston had more than eight years of supervisory experience and was a Certified Public Accountant and a Certified Internal Auditor. *Id.* at 66-72. With the specialized experience and qualifications of the selectees in mind, Manora cannot show that no reasonable person, in the exercise of impartial judgment, could have chosen Pickett, Oliver, and Langston over him for the positions in question. Accordingly, he fails to demonstrate pretext on this ground.

In sum, all of the arguments that Manora advances are insufficient to create a genuine issue of material fact that the legitimate, nondiscriminatory reasons that Potter advances are a pretext for race or gender discrimination.

**CONCLUSION**

Because Manora has not met his burden to demonstrate pretext with respect either one of his race and gender discrimination claims under Title VII of the Civil Rights Act of 1964, the Court grants summary judgment in Potter's favor .

Signed July 1, 2010.

David C. Godbey
United States District Judge